## Irwin Ames, Appellee, v. Armour and Company, Appellant.

### Gen. No. 31,451.

1. NEGLIGENCE—*effect of contributory negligence.* Proof of contributory negligence on the part of the plaintiff, in absence of a charge of defendant's wantonness, bars plaintiff from recovering for his personal injuries.

2. NEGLIGENCE—*conflicting evidence as making contributory negligence a jury question.* Whether a plaintiff was guilty of contributory negligence barring recovery for his injuries was a question for the jury under evidence so conflicting that reasonable minds might reach different conclusions.

3. MOTOR VEHICLES—*contributory negligence of switchman injured in collision between car and train.* A judgment for plaintiff for damages for his personal injuries will be reversed as based on a verdict against the weight of the evidence which showed that the plaintiff, a switchman in charge of a railway train in interstate commerce, instead of prudently signaling his engineer to stop his backing train upon sighting a truck about to cross the tracks, climbed down the end car with the design of shutting off the air coupling and was injured in so doing by the car's colliding with the truck.

4. WORKMEN'S COMPENSATION—*inapplicability to workman engaged in interstate commerce.* A railway switchman, engaged in interstate commerce at the time he was injured by a truck colliding with the railway car down which he was climbing, properly sought his remedy by action to recover damages instead of proceeding under the Workmen's Compensation Act.

Appeal by defendant from the Superior Court of Cook county; the Hon. JACOB H. HOPKINS, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1926. Reversed and remanded. Opinion filed October 19, 1927.

CHARLES J. FAULKNER, JR., WALTER C. KIRK and A. B. REID, for appellant.

ROYAL W. IRWIN, for appellee.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

On November 19, 1924, Irwin Ames, the plaintiff, was injured as the result of a collision between a train of the Chicago, Milwaukee & St. Paul Railway Company and a truck of Armour and Company, the defendant, at the junction of Rees and Kingsbury streets in Chicago. On July 14, 1925, he brought suit in the superior court against the defendant for damages. There was a trial, with a jury, and a verdict and judg-

ment for the plaintiff in the sum of $6,000. This is an appeal from that judgment.

The declaration consists of two counts. In the first it is alleged that on November 19, 1924, while employed by the Chicago, Milwaukee & St. Paul Railway Company, and engaged in interstate commerce, the defendant so carelessly and negligently ran, managed, operated and propelled a certain motor vehicle (a truck of the defendant) that it forcibly and violently ran into and struck against him and one of the cars of the railway company upon which he was riding as an employee, and while he was in the exercise of care for his safety.

In the second count it is alleged, further, that the defendant carelessly failed to give suitable, sufficient and proper signal and warning of the approach of the motor vehicle.

The defendant pleaded the general issue and three special pleas. In the first it is alleged that the plaintiff was in charge and control of the locomotive and cars in question; that the cars were pushed ahead of the locomotive over and across Rees street, a public street in Chicago, in violation of section 3403 of the city ordinances, which requires flagmen to be kept at the crossing; that no flagman was stationed at the crossing and that the plaintiff knew that fact but permitted the cars to be pushed over the crossing without giving any warning to the driver of the defendant's motor vehicle or truck; that as a proximate result of the violation of the ordinance, the cars were caused to collide with the defendant's motor vehicle or truck and as a result injured the plaintiff.

In the second, it is alleged that it was the duty of the plaintiff, who was in charge of the locomotive and cars, to give warning to persons passing along Rees street, at its junction with the railroad tracks, of the approach of the cars; that it had been the universal custom in Chicago to give warning, at such

crossings, of the approach of railroad cars and trains; that the plaintiff failed to give such warning, and, as a direct and proximate result, a collision occurred between the cars and the defendant's motor vehicle or truck; that the plaintiff's injuries were caused by being caught between the front railroad car, on which he was riding, and the defendant's motor vehicle or truck when they collided and was the direct and proximate result of the plaintiff's failure to give any warning of the approach of the cars, and was not due to any fault or negligence on the part of the defendant or its agents.

The third alleged that the railroad company and the defendant, at the time, were both operating under the Illinois Workmen's Compensation Law, Cahill's St. ch. 48, ¶ 201 et seq.; that the handling and switching of the freight cars was entirely an intrastate movement, and the plaintiff's only remedy was against his employer under the Compensation Law, and not against the defendant.

The plaintiff, on November 19, 1924, the date of the collision and injury, was employed and working as a switch foreman for the Chicago, Milwaukee & St. Paul Railway Company (hereinafter called the Railway Company). He was instructed, in the morning of that day by the yardmaster, who was his superior officer, to take a string of nineteen freight cars from the Division street yards of the Railway Company and put them on the Kingsbury street transfer track, about a mile away, from which place they were later to be taken by another locomotive of the same Railway Company to Bensonville, Illinois, to be put in a classification yard of that company. To reach the Kingsbury street transfer track, where the nineteen cars were to be taken, it was necessary, and it was the common practice, first, to pull them in a northerly direction out of the Division street yards, across the north branch of the Chicago River and a short dis-

tance beyond, and then push them back south on the tracks on Kingsbury street, a north and south street, until the Kingsbury transfer track was reached. Accordingly, as switch foreman, and having charge of an engine crew and two helpers, about 10:30 a. m. on the day in question, the plaintiff had an engine coupled on the north end of the string of nineteen cars, and had the air "coupled" on, and started to take them from the Division street yards to the Kingsbury street transfer track. As the train was going north out of the yards, the plaintiff got on the tail end car. When the train stopped going north and started backing south, the plaintiff and a helper, Parr, were on the top of the south car of the train, the locomotive being at the north end. The distance from the place where the train started to back south, to where the collision occurred, at the junction of Rees street, on east and west street, and the railroad track on Kingsbury street, is about three-quarters of a mile. The train was on number one track, which was the east side of the street. There are three east and west streets crossing the tracks between the place where the train started to back south and Rees street. At none of those crossings was there a flagman or cross-board sign, to warn the public. As the train backing south approached each of those streets, the plaintiff and Parr shouted at the top of their voices to call the attention of the people to keep off the crossings.

When the train, going about four miles an hour (the plaintiff put it at four miles an hour, and his witness Sack at 12 miles an hour), got to a point about 250 feet north of the Rees street crossing, the plaintiff, according to his testimony, saw, for the first time, the defendant's truck, which at that time was backing north out of the Schaefer Oil Works, about 100 feet south of Rees street, on the west side of the tracks. The driver of the truck backed north into Rees street and turned the rear of his truck to the

west. When the truck came to a stop in Rees street it was about 25 feet west of the west track, and facing east. When the plaintiff saw the truck starting to back up Rees street, the plaintiff and Parr shouted as loudly as they could to attract the attention of the driver. The truck, after backing west into Rees street, then, according to the plaintiff, after standing about a second, started east at about two miles an hour. The plaintiff, meanwhile, seeing the truck did not slacken its speed and that the driver was looking straight ahead, climbed down on the side of the car at the south end to pull the air cock, which was on the right hand side of the drawbar, to stop the train and keep it from colliding with the truck. Just before climbing down, he, the plaintiff, had signalled the engineer to slow down. The plaintiff did not get to the air cock. He got down to the bottom of the step-ladder, with his feet on the bottom stirrup, when the truck and train collided, the southwest corner of the car, where the grab irons were, and the northeast corner of the truck coming together, and, as a result, pinning the plaintiff between them, and injuring him.

At the close of all the evidence, claiming that the evidence showed conclusively, as a matter of law, that the plaintiff was guilty of contributory negligence, and that the evidence failed to show that the plaintiff was engaged in interstate commerce at the time of his injury, the defendant moved that the jury be in-structed to find the defendant not guilty, and the motion was overruled.

Did the evidence show that the plaintiff was guilty of contributory negligence? It is urged for the defendant that the plaintiff voluntarily exposed himself to a danger of which he had knowledge; that he failed to exercise ordinary precautions to avoid it and so was guilty of such contributory negligence as would prevent his recovering damages for his injuries. In such a case, it is the law that if the plaintiff was negli-

gent, and his negligence contributed to the injury, he cannot recover. As the court said in *Wilson v. Illinois Cent. R. Co.*, 210 Ill. 603:

"He could not be in the exercise of ordinary care and at the same time guilty of contributory negligence. Willfulness and wantonness not being charged, whatever the negligence of the appellee, the appellant may not recover, unless it appear that he was in the exercise of ordinary care at the time of the injury."

Whether the plaintiff, at and just prior to the time of the collision, was in the exercise of ordinary care for his own safety, we think—considering the complicated situation of facts, shown by the evidence, some of which tends to show care and some almost foolhardiness, and concerning which reasonable men might differ in their judgment—was a question of fact for the jury. And the jury having found in favor of the plaintiff, the question arises, was their finding clearly against the weight of the evidence?

The evidence of the plaintiff is that as the train was backing south he was standing upon an empty box car, the southermost of the nineteen cars, watching to see if everything was clear; that the train was going about four miles an hour; that he first saw the truck when it was backing north out of the oil station at a point of from 100 to 200 feet south of Rees street, at which time the train was 250 feet north of Rees street; that as the truck backed up, he and Parr shouted to attract the driver's attention; that the truck did not slacken its speed as he and Parr shouted; that the truck backed north to Rees street, then to the west in Rees street, and then turned and headed east and came to a stop about 25 or 30 feet west of the west track; that after the truck stopped for about a second it started east; that he saw a little of the truck driver's face, and that he, the driver, was looking straight ahead; that he started to shout to him the last time just as the driver started east; that the train

was going four miles an hour, and the truck, two; that after the truck got into Rees street, he, the plaintiff, in order to shut off the air, to stop the train and prevent a collision, got down on the left-hand (west) side of the car, the top of which was 19 feet from the ground, to pull the air cock, which was on the right-hand (east) side of the car and of the drawbar, between the right-hand corner of the car and the drawbar; that he got down to the bottom of the stepladder, with his feet on the bottom stirrup, when the truck and the car came together, corner to corner, and pinned his right leg between them; that prior to getting down, he had given the engineer a signal, "swinging him down"; that after the collision the train stopped within two or three feet. On cross-examination, he testified that in order to stop the train, he would have to get down from the top of the car, get off and "Run right around it," that is, the end of the car; that he knew there were no bells or electric signals, nor signs, at any of the crossings. When asked why he did not signal to the engineer when he was approaching Rees street and saw the driver and that the driver was not observing him, he answered, "We did, but he did not stop in time"; that he gave that signal when the train was 250 feet north of Rees street. He further testified that that signal was given after the signal "swinging him down"; that they "were swinging him down, giving him easy signs"; that "when you want to wave the engineer down, you give him a stop sign. When I was slowing the engineer down Parr started down on the other side of the car. Parr made an effort to stop it. Both of us were signalling to the engineer. We were then going about four miles an hour. At that time the truck had not started across Rees street. He was standing still." The following questions and answers were given on plaintiff's cross-examination:

"Q. Well, as you were approaching Rees street and saw the truck in the position that it was, and the

man not observing you, why didn't you give the signal to the engineer to stop the train?

"A. We did, but he did not stop in time.

"Q. How far were you from Rees street when you gave that signal?

"A. About 250 feet.

"Q. You gave that signal to the engineer at that time?

"A. After we swung him down.

"Q. You were swinging him down?

"A. We were swinging him down, giving him easy signs.

"Q. And you had the air all coupled?

"A. Yes, sir.

"Q. How far do these trains stop when the air is coupled after you give them the signal to slow down?

"A. How far?

"Q. Yes.

"A. Sometimes they won't stop very quick.

"Q. Well, do they stop within 200 feet?

"A. You can stop quicker than that, if you put on the emergency.

"When you want to wave the engineer down, you give him a stop sign. When I was slowing the engineer down Parr started down on the other side of the car. Parr made an effort to stop it. Both of us were signalling to the engineer. We were then going about four miles an hour. At that time the truck had not started across Rees street. He was standing still. We were proceeding less than four miles an hour after the truck started across Rees street.

"Q. And did the chauffeur of the truck look your way then?

"A. No, sir, he did not.

"Q. He did not see you at all then, did he?

"A. No, sir.

"Q. He did not pay any attention to you?

"A. No, he did not pay any attention to us.

"Q. And you say that you could observe it?

"A. I saw it right through the little glass in the cab and he was looking right straight east.

"Q. And he was going out that minute right out onto the Number 1 main, was he not?

"A. He was just starting—he was standing there when I seen him, and all at once when the car was on the crossing he steps on the gas and runs right into us.

"Q. All of this time, up from the 250 feet to Rees street, you were slowly indicating to the engineer to stop?

"A. Going slower right along.

"Q. When was it, then, that you gave the final signal to the engineer to stop his train after you told him to put it under control?

"A. After we told him?

"Q. Yes.

"A. We did not tell him.

"Q. Isn't that signal (indicating) to slow down?

"A. Well, we figured he was going to leave the cars at Rees street, and we did not repeat that. He couldn't see what was going on back there.

"Q. Now, at the same time that you were signalling the engineer, you were calling at the top of your voice.

"A. Yes, sir.

"Q. Now, you were not going to leave the cars right there at Rees street, were you?

"A. No, sir.

"Q. You were going to leave them about two blocks beyond, up at Halsted street?

"A. Up towards Halsted street.

"Q. That is how many feet from Rees street, about?

"A. It is a block away."

He further testified that Parr went down the ladder on the north end of the car when it was about 100

feet from Rees street, and then, in another place, testified that Parr went down when the car was 25 to 30 feet away; that he, the plaintiff, was signalling the engineer to slow down when he and Parr started down; that he did not get down, did not have time to get off; that if he had gotten off, the truck would have shoved him under the train; that when the train was within 100 feet of the crossing, the truck was standing 25 feet from the main track; that the truck did not start up until the train was on the crossing; that when Parr got down, there was danger of a collision; that at that time, "We gave him (the engineer) a slow up signal," not a signal to stop; that if he had given the engineer a quick stop sign, the train could have been stopped in 10 feet; that if he, the plaintiff, had given the engineer the washout sign when Parr got down and the train was 25 to 30 feet from the crossing, the train could have stopped before it reached Rees street.

The evidence of Parr is that he first saw the truck when the train was 150 feet from the crossing; that the truck was about 10 feet from the crossing; that he and the plaintiff shouted to the driver; that as the train got near the crossing, within about 30 feet, he went to get down the north end of the car so that if there were a collision and the car was tipped over, he would not be up on top; that it was safety first with him; that there was a third man on the head (north) end of the train, on the car next to the engine, who was there to pass signals from the plaintiff and Parr to the engineer; that as they went south on Kingsbury street, no signals were given until reaching Rees street; that when the truck backed west in Rees street and was about 25 feet west of the tracks, it did not stop, the driver "just put her in gear," and went right ahead; that he made no effort to stop the train, and got down for safety; that he "thought there was a collision coming at that time, if the chauffeur did not look and see us"; that the driver did not see

them at all; that before he got down he gave the engineer a washout signal, which, with the train going four miles an hour, would, if acted upon, stop it in 15 or 20 feet; that he gave several such signals; that the third man on the car next to the engine was still there; that the plaintiff, to get the air cock, would have to go down the ladder and reach over about four feet to get hold of it; that he did not see the plaintiff give any signals of any kind to the engineer, although he was standing next to him; that they did not reduce the speed of the train at any time before the collision.

The evidence of Dobbert, for the plaintiff, is that he saw the truck, and that the driver appeared not to be looking forward, but up in the air; that as the truck backed into Rees street preparatory to going east, the train was about 15 feet from the crossing, and the truck, after backing, about the same distance away; that the truck started across Rees street at 7 or 8 miles an hour, a little faster than the train was going; that the truck was making a great noise.

The evidence of one Sack, for the plaintiff, is that when he first saw the train it was 50 or 75 feet north of Rees street, and going about 12 miles an hour; that the plaintiff, just before the collision, climbed about half way down; that when the truck started up it went four or five miles an hour.

The only occurrence witness called for the defendant was one Cooper, who drove the truck in question. His testimony is to the effect that he backed the truck from the north of the oil station into Rees street; that the rear of the truck was towards the west, and came to a stop about 15 or 20 feet west of the railroad tracks; that the truck and contents weighed about three tons; that the seat on the truck is quite far back of the radiator, and had a permanently closed top; that hearing somebody shout from the south, he looked in that direction, and then started using the first gear, and then changed into second speed; that he did not hear any noise from the north, because of

the noise of the truck; that he was not going over five miles an hour when he went into second speed, and traveling in second speed he could not go over 7 or 8 miles an hour; that he traveled in second speed approximately 16 feet before the accident happened; that he had crossed the railroad track at that point practically every day for six months; that nearly always there was one of the switchmen off the train, down ahead, standing near the crossing, from where the engineer of the train that was moving south could be signaled; that on the day in question, no one was there; that he did not hear any signal or warning given from anyone on the top of the moving car; that when he was just about over the first rails of No. 1 main track, he looked up and saw the box car bearing down upon him about six feet away; that he tried to stop, and put the truck in reverse speed, but the truck was only stopped when it was struck by the box car; that the truck was struck at the left front axle; that at the time, the front wheels had just gotten over the first rail; that the train backed into his truck, pushing it about 15 feet; that in backing from the oil station north, he had to lean over and look out from the right-hand seat of the truck; that it was impossible to see the railroad track at that angle; that the train at the time of the collision was going about 5 or 6 miles an hour; that he did not look toward the north, or he would have seen the train.

It will be seen from the evidence of the plaintiff and his witnesses, and from that of Cooper, that, although the truck driver may not have exercised ordinary care, the plaintiff himself quite obviously failed to prove that, after having such knowledge of the situation as, reasonably considered, showed that a collision was imminent, he himself was in the exercise of ordinary care. Taking the evidence of the plaintiff and his witnesses, Parr, Dobbert and Sack, together with that of Cooper, and interpreting it, as favorably as seems reasonable for the plaintiff, it still

shows that he was guilty of contributory negligence; that he was injured as the direct result of his doing things, voluntarily, that the ordinarily prudent man, possessing the knowledge the plaintiff had at.the time, would not have attempted. From his and his own witnesses' evidence, it is quite obvious that in undertaking to get down off the top of the car and pull the air cock and stop the train, he knew he was taking a dangerous chance and running the risk of being injured. He testified that when Parr got down there was danger of a collision. It is true that his conduct, from the standpoint of his employer, might be considered as highly commendable as an endeavor to protect its property, but it does not follow, therefrom, that the defendant, therefore, was liable for his injuries. He was bound, in any event, to exercise ordinary care for his own safety. If he had done so, and had properly and seasonably signalled the engineer to stop the train, instead of undertaking himself to climb down and go around in front and turn the air cock, in all probability the collision would not have taken place, and he would not have been injured.

In our judgment, the evidence is convincing that the plaintiff was guilty of contributory negligence, and that the verdict of the jury is manifestly against the weight of the evidence.

Inasmuch as it becomes necessary that the case be retried, we have examined the evidence on the question of whether or not the plaintiff at the time of the accident was engaged in interstate or intrastate commerce. In our judgment, the evidence sufficiently shows that at the time in question plaintiff was engaged in interstate commerce.

For the reasons stated above, the judgment of the superior court will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*

HOLDOM and WILSON, JJ., concur.